**BUFFALO WEAVING & BELTING CO.,**
Plaintiff,

v.

**HARRINGTON & RICHARDSON, INC.,**
Defendant.

Civ. A. No. 59-4.

United States District Court
D. Massachusetts.

Dec. 31, 1963.

Daniel Mungall, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., Roger P. Stokey, Goodwin, Procter & Hoar, Boston, Mass., for plaintiff.

Thomas H. Mahony, Edward F. Mahony, Boston, Mass., George H. Mason, Vaughan, Esty, Crotty & Mason, Worcester, Mass., for defendant.

JULIAN, District Judge.

Plaintiff brought this action to recover damages for alleged breaches of contract. The defendant denies that it committed any breaches and asserts a counterclaim against the plaintiff.

The claims are alleged to arise out of transactions that occurred in 1952 and 1953.

The evidence received at the protracted trial was voluminous.

The issues of liability were severed from those relating to damages and the trial was limited to the issues of liability.

## FINDINGS OF FACT

1. The plaintiff, Buffalo Weaving & Belting Company (Buffalo), is a New York corporation having its principal place of business in Buffalo, New York. The defendant, Harrington & Richardson, Inc. (H. & R.), is a Massachusetts corporation having its principal place of business in Worcester, Massachusetts. The amount in controversy exceeds $10.-000 exclusive of interest and costs.

2. On April 3, 1952, the defendant entered into a written contract with the United States for the manufacture and delivery of 100,000 rifles, U. S. caliber .30, M1, and for the manufacture and delivery of 1,000 sets of spare parts for the rifle (Exh. N,—the prime contract).

The contract provided for fixed unit prices for the rifles and for the sets of spare parts. The contract also required the defendant to manufacture or otherwise acquire special tooling suitable for the production of the rifles and the parts.

Payment for the special tooling was to be on a cost reimbursement basis not to exceed a stated ceiling.

The contract required the defendant to deliver 1,000 rifles in January 1953, 1,000 in February 1953, and increasing quantities each succeeding month through November 1953, totalling, in all, 100,000. The contract further required concurrent delivery of one set of spare parts for every 100 rifles.

3. The Court takes notice that at this time the United States was actively engaged in the Korean War. Active warfare did not cease until the signing of an armistice in July 1953.

4. After the award of the prime contract and sometime before July 8, 1952, a man named Fitzgerald who was vice president of Buffalo and general manager of its Philadelphia, Pennsylvania, plant, and a man named Berry who was president of Machines, Inc. (Machines), went together to Worcester, Massachusetts, and conferred with the purchasing agent of H. & R. At that conference Berry, in the presence of Fitzgerald, tried to obtain subcontract work on the rifle from H. & R. for Machines but was refused. The two had another conference with H. & R.'s purchasing agent who made it clear to both that H. & R. would not enter into any contractual relations with Machines, and that if any subcontract materialized it would be between H. & R. and Buffalo. Thereafter, by letter dated July 8, 1952 (Exh. 88), Buffalo quoted prices to H. & R. for the manufacture of six component parts of the rifle and for the special tooling required for their manufacture. By telegram dated July 9, 1952 (Exh. 89), Buffalo quoted prices to H. & R. for the manufacture of an additional component part.

5. Further negotiations followed and on August 11 and 12, 1952, H. & R. mailed the following purchase orders to Buffalo at its Philadelphia office:

| PURCHASE ORDER NO. | PART | DELIVERY TO BEGIN | EXHIBIT NO. |
|---|---|---|---|
| M–1118–C | Hammer | Sept. 30, 1952 | 2 |
| M–1479–T | Special tooling for hammer | | 1 |
| M–1106–C | Operating rod catch | Sept. 30, 1952 | 4 |
| M–1485–T | Special tooling for operating rod catch | | 3 |
| M–1108–C | Gas cylinder | Oct. 1, 1952 | 6 |
| M–1486–T | Special tooling for cylinder | | 5 |
| M–1113–C | Follower | Sept. 30, 1952 | 8 |
| M–1487–T | Special tooling for follower | | 7 |

Pursuant to the proposal made by Buffalo on August 29, 1952 (Exh. 9), and the award made by H. & R. on September 9, 1952 (Exh. 11), H. & R. on November 6, 1952, mailed the following purchase orders to Buffalo at its Philadelphia plant:

| PURCHASE ORDER NO. | PART | DELIVERY TO BEGIN | EXHIBIT NO. |
|---|---|---|---|
| M–1137–C | Operating rod assembly | Dec. 1952 | 15 |
| M–1505–T | Special tooling for operating rod assembly | | 14 |

———◆———

All the purchase orders enumerated were received by Buffalo in the regular course of mail.

Each of the five components is an essential part of the rifle.

6. At about the time that the first purchase orders were issued, H. & R., in substance, informed Buffalo that the acquisition of the special tooling and the manufacture and delivery of the components were a "crash program." Because of the urgency of the program and the importance of delivering the completed components to the defendant at the times called for by the delivery schedules, the plaintiff and the defendant, in order to expedite the manufacture of the special tools necessary to manufacture the components, decided to begin performance under the purchase orders before completion of the contract documents and also waived the requirement that the manufacture of special tools was not to be started until purchase order supplements for such tools were issued by the defendant instructing the plaintiff to proceed with their manufacture.

7. Buffalo claims that a collateral oral agreement was entered into between H. & R. and Buffalo sometime prior to September 2, 1952, which, in substance, provided that Buffalo was merely to finance Buffalo's subcontractors in the performance of the orders issued by H. & R. to Buffalo and to undertake actual performance of the orders only if

Buffalo's subcontractors failed to perform. I find on the credible evidence that H. & R. and Buffalo never entered into such an agreement. I further find that at no time either before or after the issuance of the purchase orders in August 1952 did the defendant agree either orally or in writing, or by its non-verbal conduct, to grant the plaintiff an extension of time to enable the plaintiff to take over the actual performance of the contracts from the plaintiff's subcontractors, or to transfer operations from a subcontractor's plant to the plaintiff's own plants, whether in Alliance, Ohio, or elsewhere, in the event that a subcontractor of the plaintiff failed to perform.

8. Except as stated in paragraph 9 of these findings, the only agreements entered into by H. & R. and Buffalo are set forth in the following writings:

a) the five purchase orders for the manufacture and delivery of the five components (Exh. 2, 4, 6, 8, and 15);

b) the five special tooling orders related thereto (Exh. 1, 3, 5, 7, and 14);

c) the printed terms attached to the ten purchase orders (see Exh. 52 and 53);

d) the supplements to said purchase orders dated November 6, 1952, and November 24, 1952 (Exh. 16, 17, 18, 19, and 29);

e) supplements Nos. 1 and 2, which extended the times for the delivery of the components (Exh. 21, 23, 25, 27, 33, 35, 36, 37, and 38);

f) the special tooling purchase order No. M–4260–T (Exh. 45) consolidating the original five special tooling purchase orders.

9. Sometime before September 9, 1952, H. & R. agreed to deliver certain machine tools to Buffalo for the manufacture of the operating rod assembly. This agreement is evidenced in part by Exhibits 10 and 31.

10. On August 29, 1952, H. & R. informed Buffalo by telegram (Exh. 91) that the purchase order terms and conditions would be amended to conform to those discussed in the minutes of a meeting held on August 14, 1952 (Exh. 90). The amendments finally adopted are set forth in letter supplements to the purchase orders mailed to Buffalo by H. & R. (Exh. 16, 17, 18, 19, 29) and assented to by Buffalo (Exh. 28, 30).

11. By written agreement dated September 2, 1952 (Exh. 54), supplemented by an agreement dated September 19, 1952 (Exh. 55), Buffalo subcontracted all the purchase orders for the components and for the special tooling to Machines, Inc.

12. In subcontracting to Machines the plaintiff acted on its own initiative and responsibility and did not act for the defendant. The defendant never requested the plaintiff to subcontract to Machines or to finance Machines in the performance of any contract between the defendant and the plaintiff.

13. As between H. & R. and Buffalo, the responsibility for the processing, design, and acquisition by manufacture or otherwise of the special tooling, and for the production and delivery of the five components was solely on Buffalo. H. & R. never directly or indirectly entered into any contractual relations or agreements with Machines in respect to any of the purchase orders issued by H. & R. to Buffalo.

14. Immediately after the execution of the agreement of September 2, 1952, with Buffalo, Machines issued four purchase orders dated September 2, 1952 (Exh. 78, 79, 80 and 81), to the N. S. T. Corporation (NST) for the production of the hammer, operating rod catch, gas cylinder, and follower.

15. Following the execution of the agreement of September 2, 1952, between Buffalo and Machines, and the supplemental agreement of September 19, 1952, Machines began the work of designing the special tooling required under its processing for the production of the five components. For this purpose it utilized at first the services of Machine Tool and Design Company. This company's work

proved unsatisfactory and too slow, and after about two months its services were terminated by Machines. Later on, the services of General Design Company of Philadelphia and of a small division which Machines set up in its own organization were used to design the special tools.

16. In August, September and October, 1952, Machines had no machine tools on hand anywhere for the manufacture of any of the five components.

17. In October, 1952, Machines had no special tools on hand designed for the making of any component except 17 special tools for the gas cylinder, of which 11 were gauges used for measuring after the tool had been machined. Production of the gas cylinder required about 123 separate and distinct items of special tooling. An estimated average of 104 special tools were needed for the manufacture of each component.

18. The operations of Machines were under the general supervision of Fitzgerald, a vice president of Buffalo, who was directly in charge for Buffalo of the performance of Buffalo's agreements with H. & R. A man named Bry, assistant to the president of Buffalo, but having little experience in industrial production, was assigned on a full-time basis to the plant operated by Machines.

19. On November 10, 1952, H. & R. mailed to Buffalo eight supplemental purchase orders (Exh. 20 through 27) dated November 10, 1952, each designated as Supplement No. 1, each relating to one of the purchase orders dated August 11 and August 12, 1952 (Exh. 1 through 8), and each of which incorporated by reference the modifications set forth in the supplemental letters of November 6, 1952 (Exh. 16 through 19). Supplement No. 1 to each purchase order relating to the components also revised the delivery schedule. It extended the time of the first delivery on the hammer (Exh. 21), the catch (Exh. 23), the follower (Exh. 27), and the gas cylinder (Exh. 25) to December 1952.

20. On November 14, 1952, Buffalo mailed to H. & R. a letter (Exh. 28) enclosing copies of the H. & R. letters of November 6, 1952 (Exh. 16 through 19) and of the Supplements No. 1 dated November 10, 1952 (Exh. 20 through 27) all of which had been signed by Buffalo. Until November 14, 1952, Buffalo had not signed and returned any of the purchase orders because it was waiting for the modifications in the printed terms and conditions. (Exh. 16 through 19).

21. On November 24, 1952, H. & R. mailed a letter (Exh. 29) to Buffalo containing the modifications in the printed terms and conditions of the purchase orders relating to the operating rod assembly (Exh. 14 and 15). The letter was received by Buffalo on November 26, 1952. On December 16, 1952, Buffalo mailed its acceptance (Exh. 30) to H. & R.

22. The progress being made by Buffalo in the acquisition of the special tools was very slow, and as early as November 1952, Quick, president of H. & R., informed Fitzgerald that there was concern on the part of H. & R. about getting delivery of the components in sufficient time to meet the schedules under the prime contract. Fitzgerald assured him that there would be performance by Buffalo.

23. H. & R.'s apprehension deepened during the weeks that followed, and about the middle of December 1952 a conference was held in Worcester by representatives of H. & R. and Buffalo concerning Buffalo's ability to meet delivery schedules. As a result of the conference, representatives of H. & R., together with Fitzgerald, visited Machines in Philadelphia on December 19 and 20 and made a detailed study of the operations.

A report was prepared by H. & R.'s representatives and submitted to the president of H. & R. A copy of the report was mailed to Fitzgerald and he received it on January 2, 1953 (Exh. 99). In the letter (Exh. 98) which accompanied the report the president of H. & R. stated to Fitzgerald:

"As discussed by telephone, I am forwarding to you the engineering

report compiled by our men who visited your plant on December 19 and 20, 1952. You will note that the statements are quite frank * * *. I will appreciate your comments concerning their suggestions and criticisms. * * * Your written assurance of your plans to correct existing problems and get into production will be invaluable in establishing the confidence of our District [Boston Ordnance District] in the soundness of the H. & R. subcontract program, which has included Buffalo Weaving and Belting in a major capacity. I sincerely trust our people have been of assistance. Please call on us if you feel we can be of further help. May I have your comments at an early date?"

24. On January 29 and 30, 1953, H. & R. mailed to Buffalo Supplements No. 2 which revised the delivery schedule by extending the time for the first delivery of the catch, gas cylinder, follower, hammer, and operating rod assembly to March 1, 1953 (Exh. 33, 35, 36, 37, 38). These supplements were received by Buffalo in due course.

Supplements No. 2 set forth a schedule which required Buffalo to deliver to H. & R. stated quantities of the five components on March 1, 1953 and on the first of each succeeding month until the total quantities called for by the purchase orders were delivered.

Supplements No. 2 also required Buffalo to submit to H. & R. a 100-piece pilot lot of each component for inspection and approval before proceeding with production.

25. The special tooling purchase orders issued by H. & R. and accepted by Buffalo provided for the payment of the following prices by H. & R.:

Special tooling for the hammer, an amount "not exceeding $5,690" (Exh. 1);

Special tooling for the catch, an amount "not exceeding $20,300" (Exh. 3);

Special tooling for gas cylinder, an amount "not exceeding $86,200" (Exh. 5);

Special tooling for the follower, an amount "not exceeding $40,000" (Exh. 7);

Special tooling for operating rod assembly, an amount "not exceeding $50,000" (Exh. 14).

26. By letter of January 28, 1953, H. & R. informed Buffalo of the procedure which the Boston Ordnance District (BOD), which was in charge of the prime contract for the government, required subcontractors of the prime contractor on the M-1 Rifle program to follow in order to obtain reimbursement for special tooling (Exh. 40).

By letter of February 4, 1953 (Exh. 41), Buffalo informed H. & R. that the suggested procedure outlined in H. & R.'s letter of January 28, 1953, would not be followed. Negotiations ensued which resulted in the agreement by the parties that the acquisition of the special tools by Buffalo and reimbursement for them by H. & R. was to be governed by the consolidated special tooling purchase order No. M-4260-T dated March 18, 1953 (Exh. 45).

27. Buffalo regarded the consolidation of the original special tooling purchase orders into purchase order No. M-4260-T (Exh. 45) to be of mutual advantage to H. & R. and Buffalo; to H. & R. because it would facilitate reimbursement to H. & R. by the government, and to Buffalo because it would relieve Buffalo of possible losses under those original special tooling purchase orders where the ceiling price proved to be too low. The combined ceiling of $202,240 in the consolidated purchase order replaced the individual ceilings in the five original special tooling purchase orders.

The intent of the parties in agreeing to consolidate the five original special tooling purchase orders into one special tooling purchase order was to establish a single ceiling price for all the special tools to be acquired by Buffalo for the

manufacture of the five components and to provide for the payment of the special tools by H. & R. to Buffalo on a cost reimbursement basis in accordance with Section XV, "Contract Cost Principles," of the Armed Services Procurement Regulation, so that in turn H. & R. could be reimbursed by the government for the special tools on the same basis under the prime contract.

28. The provisions of Section XV of the Armed Services Procurement Regulation in effect at all times pertinent to this case were as they appear in Exhibit 106.

29. The first 26 requests for advance payments submitted by Machines to Buffalo under their agreement of September 2, 1952, were paid by Buffalo. They were in the form of invoices listing expenses either incurred or anticipated by Machines. The first request was dated September 8, 1952; the twenty-sixth was dated February 26, 1953. They covered the period beginning August 18, 1952, and ending March 1, 1953. The twenty-sixth request was paid on March 5, 1953. No subsequent requests were paid. The total amount advanced on the 26 requests was $163,934.66. Two additional sums were paid by Buffalo to Machines, one on March 20, 1953, in the amount of $5,000, the other on March 27, 1953, in the amount of $1,500. There is no indication that the books and records of Machines were ever audited by or in behalf of Buffalo or any other person to verify any of the items listed on the 26 requests or invoices that were paid.

30. After March 5, 1953, Buffalo stopped paying requests for advances submitted by Machines because of the latter's unsatisfactory performance and its inability to meet delivery schedules. Machines in turn refused to supply the supporting data, such as engineering and production costs, needed by Buffalo to obtain reimbursement from H. & R. under the consolidated special tooling purchase order (Exh. 45) for the special tools manufactured by or for Machines.

H. & R. was not apprised of this fact until long after the issuance of the consolidated special tooling purchase order on March 18, 1953.

31. Refusal by Buffalo to honor Machines' requests for further advances created credit difficulties for Machines with its vendors and rendered Machines even less able to perform its contract with Buffalo.

32. The consolidated special tooling purchase order No. M–4260–T (Exh. 45) provided that Buffalo was to be reimbursed for such costs and expenditures as were approved or ratified by H. & R., and that the principles for the determination of costs were to be in accordance with cost accounting practices and auditing standards as set forth in Section XV, "Contract Cost Principles," of the Armed Services Procurement Regulation (Exh. 106).

33. The costs for which Buffalo sought reimbursement under the consolidated special tooling purchase order (Exh. 45) were not determined in accordance with cost accounting practices and auditing standards as required by Section XV of the Regulation (Exh. 106) and were never approved or ratified by H. & R.

34. The prices charged by Machines to Buffalo for such special tools as it produced or acquired and for which Buffalo sought reimbursement from H. & R. were not shown to be reasonable. On the contrary, they were in fact unreasonably high and in some instances grossly inflated. Buffalo, in the exercise of ordinary diligence, should have known that the prices it was being charged by Machines were excessive. Although the contract between Buffalo and Machines required Machines to maintain separate books and records in connection with the performance of the contract and gave Buffalo the right to inspect such books and records, neither Buffalo nor anyone acting for it ever audited or inspected them to determine the reasonableness of the prices charged. There is no indication that they were ever audited by anyone.

In arriving at prices for special tools charged by Machines to Buffalo, Ma-

chines added a so-called "load factor" amounting in many instances to 200 per cent, 250 per cent, or more, of the unit cost. The "load factor" was based upon unverified elements of cost and was essentially an arbitrary percentage of the claimed unit cost.

35. The defendant's withholding of payment for the special tooling was justified by the plaintiff's failure to furnish the defendant with data showing the reasonableness of the cost of the tools for which the plaintiff sought reimbursement.

36. The withholding of the payment of the invoices by the defendant was not in fact a cause of non-performance or of delay in performance by the plaintiff of its agreements with the defendant.

37. As late as March 1, 1953, the date on which it was to make its first deliveries, Buffalo had not acquired by manufacture or otherwise sufficient special tooling to begin the manufacture of any one of the component parts. A few days later it sent its chief engineer and five other engineers from its Ohio division at Alliance, Ohio, to Philadelphia to investigate the ability of Machines and NST to produce the component parts called for by the purchase orders. These men made a thorough check of the plants of Machines and NST. On the basis of the chief engineer's report dated March 17, 1953, to the president of Buffalo (Exh. A), and other evidence, I find that as of the early days of March 1953, due to lack of coordination, proper follow-up, and shortage of skilled manpower at Machines, it would be many months before any component parts would be produced; that unless a better organization was set up with added equipment, production requirements would never be met; that floor space allocated to work under the four purchase orders at NST was inadequate to handle all four parts; that good inspection presented a problem; and that it was quite unlikely that NST could ever produce all four parts without dropping some of its other products. All these facts were known to Buf-

falo by the middle of March 1953. In the exercise of ordinary diligence Buffalo should have known them long before March 1, 1953.

Buffalo did not apprise H. & R. of the contents of the chief engineer's report.

Although in default as of March 1, 1953, Buffalo did nothing that was substantially effective to remedy the deficiencies disclosed by the investigation conducted by its own engineers.

On the contrary, Buffalo's ability to perform deteriorated still more during the weeks that followed.

38. By letter dated March 19, 1953, the president of H. & R. wrote to the president of Buffalo, stating,

"[M]ay I emphasize the extreme importance of your meeting the commitments you have made regarding Delivery and Quality. We, as the Prime Contractor, have made promises to the Government based on your schedules, and those of our own manufacturing departments. Failure of one supplier will prevent the meeting of final commitments to the Government. The first complete Rifles must be delivered to Springfield Armory in April, 1953, for testing. Production from May on is as established on your schedules." (Exh. 115)

39. On March 20, 1953, H. & R. advanced $20,000 to Buffalo as a tentative payment on eleven invoices listed in Exhibit I "subject to adjustment in accordance with all the terms, conditions and requirements as described in our Purchase Orders M–1505–T and M–4260–T, as now in effect. * * * By making payment * * * Harrington & Richardson Arms Company does not release and/or waive any rights, terms and conditions of the above-mentioned Purchase Orders."

40. On April 10, 1953, a conference was held with representatives of the Boston Ordnance District. Representatives of H. & R. and representatives of Buffalo, including Merriam, its president,

were present. The purpose of the conference was to inform BOD about some of the problems encountered by H. & R. with Buffalo, particularly with reference to the reimbursement of Buffalo for the special tooling without the submission of supporting documentation as to costs. Merriam stated, in substance, that Buffalo had attempted to obtain the supporting data covering the special tooling from Machines but until then had not been successful. Merriam doubted if Machines would ever furnish them. The BOD representative informed them that the requirements of the contract between H. & R. and Buffalo relating to reimbursement had to be met before reimbursement could be made.

41. By letter of April 23, 1953 (Exh. 76), NST notified Machines that it thereby declared NST's contracts with Machines "to have been defaulted" because of Machines' failure, despite repeated demands, to supply necessary tooling and forgings and to pay invoices. It further notified Machines that as of April 23, 1953, it was discontinuing work on all purchase orders subcontracted to it by Machines on September 2, 1952, namely, the hammer, gas cylinder, catch, and follower.

42. On May 1, 1953, Buffalo notified Machines (Exh. 77) of immediate cancellation of all agreements between them and directed Machines to cease all work. It charged Machines with having failed to perform its agreements with Buffalo.

43. Representatives of H. & R. and Buffalo met in Worcester on May 4, 1953, at the request of Buffalo. The purpose of this meeting was to find a solution to Buffalo's problems. NST's cancellation of Machines and Buffalo's subsequent cancellation of Machines were discussed. Merriam, president of Buffalo, requested orally an extension of time to transfer operations for the production of the components to its own plant in Alliance, Ohio. The request came more than two months after March 1, 1953, the date on which the first deliveries of the five components by the plaintiff to the defendant were required by the purchase orders as modified. The requested extension was for a period of 45 to 60 days from May 4, 1953. The request was conditioned upon the plaintiff first being reimbursed by the defendant for an unascertained number of special tools. At the time the request was made, the prime contract (Exh. N) as amended by Exhibit O called for the approval of rifle samples in April 1953 and for the first delivery of the completed rifle in May 1953, as the plaintiff then knew and had known at least since about March 19, 1953.

As of May 4, 1953, Buffalo had not submitted a pilot lot of any component for inspection and approval as required by Supplements No. 2 to the purchase orders (see par. 24 of these Findings). It never reached the point where it could manufacture any pilot lot.

As of May 4, 1953, the plaintiff lacked a substantial number of special tools needed to begin to manufacture any one of the five components. About 15 to 20 per cent of the special tools it had acquired were not suitable for use and needed reworking.

On May 4, 1953, work under all the purchase orders was at a standstill, and had been at least since May 1, and the plaintiff was so situated as to special tooling and available plant facilities that it was most improbable that it could have commenced production of the components within 60 days either at Alliance, Ohio, or elsewhere. As of May 4, 1953, Buffalo's estimate of 60 days was mere speculation.

Quick, president of H. & R., refused to agree to the extension and told Merriam, in substance, that unless some mutually satisfactory disposition of the entire relationship between H. & R. and Buffalo could be worked out that day, H. & R. was going to cancel out Buffalo. After detailed negotiations, the parties reached tentative agreement that day on many terms which were noted down in a pencilled writing headed "Agreement Pro-

184

posals" (Exh. 116).[1] The negotiations were never concluded.

As of May 4, 1953, Buffalo had failed to furnish H. & R. with the requisite supporting data to justify the reimbursement of Buffalo for the cost of such special tools as it had acquired and no solution had yet been found to Buffalo's predicament in that respect.

Buffalo's request for an extension of 45 to 60 days was unreasonable in the circumstances existing on May 4, 1953. H. & R. had given Buffalo ample notice of the urgency of performance and ample opportunity to perform.

44. By letter of May 8, 1953, received by H. & R. on May 11, Buffalo gave H. & R. notice of cancellation of the agreements between them, and expressed its intention of holding H. & R. liable. (Exh. 117)

45. In its reply of May 14, 1953, H. & R. acknowledged receipt of the May 8 letter, charged Buffalo with failure to perform and with attempting to evade responsibility for its default, expressed its intention to hold Buffalo responsible in damages, and demanded repayment of the sum of $20,000 it had paid Buffalo. (Exh. K)

46. Despite the assurance contained in its letter of October 15, 1952 (Exh. 12), to H. & R., Buffalo failed to furnish sufficient additional engineers and production personnel to solve production problems as they arose.

47. Although Machines had clearly failed in the performance of its obligations to Buffalo by March 1, 1953, Buffalo took no action to undertake the actual production of the component parts itself as it had assured H. & R. it would do in its letter of October 12, 1952 (Exh. 12).

48. Prior to September 9, 1952, H. & R. had agreed to supply Buffalo with certain machine tools for use in the manufacture of the operating rod assembly. H. & R. delivered all these machine tools with the possible exception of one of four Cincinnati 0-8 milling machines.

One of these four was needed for contingencies. Some of the machines that were delivered were not in operating condition. The adjustments they required, however, were mostly minor. H. & R.'s failure in this respect was not wilful, was not of substantial significance and was not a causative factor in Buffalo's failure to perform. Furthermore, there is no evidence that Buffalo complied with paragraph 35(b) of the additional terms and conditions attached to the purchase orders which required a request for an extension of time if H. & R. failed to deliver machinery and provided for an equitable adjustment upon written request of Buffalo.

49. The defendant processed and approved requisitions and issued supplemental special tooling purchase orders in accordance with the agreements between H. & R. and Buffalo. The plaintiff's failure to perform its obligations under the agreements and its inability to furnish supporting data for reimbursement under purchase order No. M-4260-T (Exh. 45) were not caused in whole or in part by any delay on the part of the defendant in processing and approving requisitions or in issuing supplemental purchase orders.

50. The plaintiff failed to manufacture or otherwise acquire sufficient special tooling to produce any one of the five components called for by the purchase orders.

51. The plaintiff never produced or delivered to the defendant any of the component parts called for by the purchase orders.

52. H. & R. did not hinder or interfere with the performance of the agreements by the plaintiff. Nor did the defendant interfere with or hinder performance by Machines of its agreement with Buffalo, or by NST of its agreements or arrangements with Machines.

53. Before receiving Buffalo's letter of cancellation of May 8, 1953, the de-

1. Plaintiff expressly disclaims basing any right of recovery on the "Agreement Proposals" of May 4, 1953 (Exh. 116).

fendant placed no orders with NST or any other person to do any of the work previously contracted to Buffalo.

54. H. &. R. made no inquiries as to possible successors to Buffalo in the manufacture of the components until after Buffalo had given indications in April 1953 of its probable inability to perform and of its desire to be relieved of its contractual obligations under the purchase orders.

55. Section 30 of the terms attached to every purchase order provided as follows:

"Productive capacity. Seller [Buffalo] represents and agrees that with facilities, equipment, tools or other property to be furnished by Buyer [H. & R.] and/or Government, if any, as specified herein or herewith, it will have available in its own plant, plus its sub-contractor's for the use of the Buyer in the performance of said Government contract, a production capacity, with reference to the work and articles covered by this order, sufficient to enable Buyer to produce 50,000 rifles U. S. Caliber .30, M1 and concurrent spare parts per month, based on a three (3) shift six (6) day week operation. * * *"

At no time from August 1952, to and including May 8, 1953, when Buffalo by its letter of May 8, 1953 (Exh. 117), purported to cancel its contractual relations with H. & R., did Buffalo have available in its own plant plus its subcontractor's, the production capacity required by said Section 30 with reference to work and articles covered by the purchase orders.

At no time during that same period did Buffalo, through subcontractors or otherwise, provide sufficient plant capacity or sufficient personnel to perform its contracts with H. & R.

56. Item #5 in the supplements dated November 6, 1952, as to four components and related special tooling purchase orders (Exh. 16, 17, 18, 19), and in the supplement dated November 24, 1952, as to the operating rod assembly and related special tooling purchase order (Exh. 29) reads as follows:

"Delivery must actually be effective within the time stated on the purchase order or supplement thereto, failing which Buyer [H. & R.] reserves right to cancel order and to charge Seller [Buffalo] with any loss resulting from Seller's failure to comply with delivery schedule. Except Seller shall not be liable for any delay in manufacturing or delivery if such delay shall be due to one or more of the following causes: [specific causes are here enumerated] or any other causes whatsoever, whether similar or dissimilar to those hereinbefore enumerated, beyond the reasonable control of the Seller and not due to fault or negligence on the part of the Seller."

In this case Buffalo's substantial failure to manufacture or otherwise acquire sufficient special tools and its total failure to manufacture and deliver the component parts was not due to any of the enumerated causes or to any other cause beyond the reasonable control of Buffalo, but to Buffalo's own fault and negligence in failing to provide sufficient productive capacity, adequate plant facilities and equipment, adequate engineering, inspection personnel, and other skilled manpower, and adequate organization and coordination for the performance of its obligations under the purchase orders.

57. In the circumstances of this case I find that the total failure on the part of Buffalo to manufacture and deliver the components by May 4, 1953, and its prospective inability as of that date to manufacture and deliver them for a long and indefinite period of time amounted to a material breach of its agreements with H. & R.

I also find that Buffalo's substantial failure by May 4, 1953, to acquire by manufacture or otherwise sufficient special tools for the manufacture of the components amounted to a material breach of its agreements with H. & R.

186

58. H. & R. was not in default in the performance of any of its obligations under its agreements with Buffalo.

59. H. & R. received no benefit from Buffalo's ineffectual attempt to perform its agreements with H. & R. or from Buffalo's advance payments to Machines.

CONCLUSIONS OF LAW

1. Massachusetts and Pennsylvania are the only two jurisdictions in which the transactions between the parties occurred. Since the substantive law applicable to the facts of this case is essentially the same in both jurisdictions, it makes no difference which law is applied.

2. The promises, terms and conditions contained in the writings enumerated in paragraph 8 of the Findings of Fact were assented to by both parties and became legally binding on the plaintiff and the defendant. The promise to supply machine tools as set forth in paragraph 9 of the Findings of Fact became legally binding on the defendant.

3. There is no need at this time to determine whether the agreements between the plaintiff and the defendant resulted in a single overall contract or a group of contracts.

4. The plaintiff is not entitled to recover against the defendant.

5. There was no substantial performance by the plaintiff of any of its obligations to the defendant.

6. There was a substantial and material failure on the part of the plaintiff to acquire by manufacture or otherwise sufficient special tools to manufacture any one of the component parts. There was a total and material failure on the part of the plaintiff to manufacture and deliver the component parts.

7. The plaintiff's failure to perform was not legally justified or excused by any act or omission on the part of the defendant.

8. There was no legal justification or excuse for the plaintiff's non-performance by reason of any act or omission on the part of any person for whose conduct the defendant was in any way responsible.

9. Non-payment by the defendant of invoices submitted by the plaintiff under the consolidated purchase order for special tooling was legally justified by the plaintiff's failure, through no fault of the defendant, to submit the requisite data as to costs.

10. The plaintiff was not entitled to the extension of time it requested on May 4, 1953, and the defendant violated no right of the plaintiff in refusing to grant it. By May 4, 1953, a reasonable time for performance under the plaintiff's theory of waiver of time for performance had passed. The defendant's letter of March 19, 1953 (Exh. 115), clearly satisfies the requirement that there be notice that timely performance was expected (see pars. 38 and 43 of the Findings of Fact).

11. In addition to the material breaches previously committed by the plaintiff, its letter of cancellation of May 8, 1953, constituted a repudiation of its obligations to the defendant and an expression of its intention to perform no further. This in itself was a total breach by the plaintiff which justified the defendant in regarding its contractual relations with the plaintiff as at an end.

12. The defendant is entitled to recover on its counterclaim for the plaintiff's failure to perform its contractual obligations under the consolidated purchase order for the special tooling and under the original purchase orders for the components as subsequently modified and supplemented.

13. The defendant is also entitled to recover the sum of $20,000 which it conditionally paid to the plaintiff on March 20, 1953. The plaintiff failed to fulfill the conditions which would allow it to retain the payment.

14. The plaintiff's amended complaint is ordered dismissed and trial is ordered on the defendant's counterclaim on the question of damages.